UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL B. NEUWIRTH,

<table>
<tr><td></td><td>**COMPLAINT**</td></tr>
<tr><td>Plaintiff,</td><td></td></tr>
<tr><td>vs.</td><td>Civil Action No. _____</td></tr>
<tr><td></td><td>**JURY TRIAL DEMANDED**</td></tr>
<tr><td>MedCPU, INC.,</td><td></td></tr>
<tr><td>Defendant.</td><td></td></tr>
</table>

Plaintiff Daniel B. Neuwirth ("Neuwirth"), by and through his counsel, LeClairRyan, A Professional Corporation, alleges as follows:

## THE PARTIES

1.     Neuwirth is an individual who resides at 8702 Butterfield Avenue, Richmond, Virginia 23229.

2.     Defendant MedCPU, Inc. ("Defendant") is a Delaware Corporation with a principal place of business at 100 Wall Street, Suite 2202, New York, New York 10005.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because this is an action between citizens of different states and the matter in controversy exceeds the sum or value of Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

4.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant is resident in this District and a substantial part of the events giving rise to Neuwirth's claims occurred in this District.

## NATURE OF ACTION

5.      This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, equitable estoppel, and fraudulent inducement arising from false promises, misrepresentations, and bad-faith conduct by Defendant designed and intended to deprive Neuwirth of vested stock options granted to Neuwirth by Defendant.

## NEUWIRTH'S EMPLOYMENT WITH DEFENDANT

6.      Defendant is a health information technology company that provides information management solutions to healthcare providers and healthcare professionals.

7.      On May 2, 2011, Neuwirth became an employee of Defendant.

8.      Neuwirth was initially hired to serve as the President and Chief Executive Officer of MedCPU Americas.  In such role, he was an officer of Defendant and was a member of Defendant's Board of Directors.

9.      On May 2, 2011, Neuwirth entered into an Executive Employment Agreement and a Loyalty Agreement with Defendant.

10.      Neuwirth continued his employment with Defendant until February 28, 2015.

11.      Immediately prior to Neuwirth leaving Defendant's employ, he had the title of President and Chief Executive Officer, MedCPU Americas, and he was a member of Defendant's Board of Directors.

12.      In general, during his period of employment with Defendant, Neuwirth's job responsibilities with Defendant included the following: serving on the Board of Directors, developing and executing the company strategy, driving growth, financing, and managing company operations.

## NEUWIRTH'S STOCK AND STOCK OPTIONS

13.     In connection with Neuwirth's employment with Defendant and as part of his compensation, Defendant granted Neuwirth common stock, preferred stock, and stock options issued by Defendant.

14.     Specifically, on December 12, 2012, Defendant granted Neuwirth two tranches of stock options. The first tranche of stock options included options for 64,866 shares (the "First Tranche"). The second tranche of stock options included options for 49,610 shares (the "Second Tranche").

15.     At the time Defendant granted these stock options to Neuwirth, Defendant had a 2009 Share Option Plan (the "Option Plan").

16.     The Option Plan set forth certain policies relating to stock options issued by Defendant.

17.     The Option Plan has no integration clause that indicates that its provisions set forth all terms relating to an employee's rights regarding stock options.

18.     The Option Plan sets out procedures and timing for the vesting of stock options and the exercise of stock options.

19.     In the event of termination of employment, the Option Plan sets out certain procedures for exercise of stock options. Included in those procedures is Section 10.1.4, which provides as follows:

> 10.1.4. If the Grantee's Cessation of Employment is due to any reason other than those stated in Sections 10.1.3, 10.1.5 and 10.1.6 herein, such Options (to the extent vested at the Date of Cessation) shall be exercisable at any time until the lapse of three (3) months from the Date of Cessation (but in no event after the expiration date of such Options), and shall thereafter terminated; provided, however, that if the Grantee dies within such period, such Options (to the extent vested at the Date of Cessation) shall be exercisable by the Grantee's legal

representative, estate or other person to whom the Grantee's rights are transferred by will or by laws of descent or distribution at any time until the lapse of twelve (12) months from the Date of Cessation (but in no event after the expiration date of such Options), and shall thereafter terminate. Notwithstanding the above, if at the Date of Cessation the Grantee is precluded from exercising the Options due to any "Blackout" period or any other similar restriction in accordance to any applicable law or any Company's internal directive, then the period of three (3) months or twelve (12) months (as the case may be) shall begin only at the end of such restriction.

20.     However, Article 10 of the Option Plan makes clear that at all times the

"Committee," as defined under the Option Plan, has the discretion and authority to modify the

rules and procedures for exercise of the stock options.  Specifically, Section 10.3 of the Option

Plan provides as follows:

> 10.3.  Notwithstanding the foregoing provisions of this Section 10, the Committee shall have the discretion, exercisable either at the time an Option is granted or thereafter, to:
>
> 10.3.1.  Extend the period of time for which the Option is to remain exercisable following the Date of Cessation to such greater period of time, as the Committee shall deem appropriate, but in no event beyond the specified expiration of the term of the Option;
>
> 10.3.2.  Permit the Option to be exercised, during the applicable exercise period following the Date of Cessation, not only with respect to the number of Shares for which such Option is exercisable at the Date of Cessation but also with respect to one or more additional installments in which the Grantee would have vested under the Option had the Grantee continued in the employ or service of the Company.

21.     Consistent with the provisions of Section 10.3 of the Option Plan with regard to

Neuwirth's First Tranche of 64,866 stock options, the Committee granted Neuwirth a five-year

period to exercise those options.

22.     With regard to the First Tranche of 64,866 options, at the time of cessation of

Neuwirth's employment with Defendant, all of those stock options had vested.

23.     With regard to the Second Tranche of 49,610 options, 33,073 of those stock options had vested as of the date Neuwirth ceased being employed by Defendant.

## DEFENDANT'S COURSE OF PERFORMANCE
## REGARDING STOCK OPTION GRANTS

24.     Consistent with Section 10.3 of the Option Plan, for many years Defendant had consistently adopted a course of performance in connection with the exercise of stock options that allowed employees extended periods of time to exercise stock options beyond the timing procedures set forth in the Option Plan.

25.     Specifically, on numerous occasions and in a consistent manner, Defendant extended stock option exercise time periods for current and former employees and current and former members of Defendant's Board of Directors to allow those individuals additional time to exercise those stock options.

26.     For example, in 2013 Defendant's Board of Directors formally resolved to allow current and former employees, former consultants, and former members of Defendant's Board of Directors to "catch up" on the exercise of vested stock options by waiving and extending stock option exercise periods for such former employees and former members of Defendant's Board of Directors who left Defendant's employ prior to that date. The individuals who benefited from this "catch up" were given a complete waiver of the requirement in the Option Plan to exercise stock options upon a time period after ceasing employment with Defendant. The only limitations on option exercise for these individuals were the time periods set forth in each of their respective option agreements.

27.     In connection with the 2013 Board of Directors' action and otherwise, numerous current and former employees, former consultants, and former members of Defendant's Board of

Directors were given additional time periods to exercise stock options, including Ernie Berger, Moe Alkhafaji, Drexel Partners, Mark Gross, David Seligman, and Jeff Finkelstein.

28.     Indeed, with regard to the First Tranche of stock options, Defendant's Board of Directors specifically granted Neuwirth a five (5) year time period to exercise those stock options.

29.     From the time Neuwirth became an employee of Defendant until the cessation of his employ with Defendant, Defendant consistently allowed extended time periods for the exercise of stock options and, upon information and belief, consistently did not enforce the specific timing provisions in the Option Plan for the exercise of stock options.  Prior to termination of Neuwirth's employment, Neuwirth is aware of no employee who had to forfeit stock options based on not exercising stock options within 90 days of termination of employment without being first advised that they would be required to comply with the 90-day time period requirement in the Option Plan.

30.     In connection with this policy and course of performance, executives of Defendant and Defendant's Board of Directors consistently represented to management-level employees of Defendant, including Neuwirth, that Defendant would not hold them to the strict timing provisions in the Option Plan for the exercise of stock options, and that it was Defendant's policy, approach, and course of performance to extend stock option exercise time periods.

31.     These representations were made to many employees of Defendant, including Neuwirth.

## NEUWIRTH LEAVES HIS EMPLYOMENT WITH DEFENDANT

32.     On or about May 4, 2015, Neuwirth entered into a Confidential Separation Agreement and Mutual General Release with Defendant ("Separation Agreement"), which was effective April 6, 2015.

33.     Under the Separation Agreement, Neuwirth and Defendant agreed that Neuwirth's employment with Defendant ended effective February 28, 2015.

34.     The Separation Agreement also provided that Neuwirth would continue to have rights in and own all restricted shares that had vested as of December 31, 2014, and that Neuwirth would continue to own all stock options that had vested as of December 31, 2014.  The Separation Agreement also included a schedule of Neuwirth's vested and unvested shares and stock options.

35.     Nowhere in the Separation Agreement did Defendant specifically require Neuwirth to exercise his stock options in accordance with the timing provisions in the Option Plan.  The Separation Agreement only states that Neuwirth's vested stock options "will remain in effect in accordance with their terms."

## DEFENDANT'S REPRESENTATIONS REGARDING NEUWIRTH'S STOCK OPTIONS

36.     In connection with execution of the Separation Agreement, Neuwirth had numerous conversations with senior executive officers of Defendant and members of Defendant's Board of Directors regarding the timing for the exercise of his stock options.

37.     Numerous senior executive officers of Defendant and members of Defendant's Board of Directors represented to Neuwirth that Defendant had routinely allowed additional time periods for stock option exercise beyond the timing provisions set forth in the Option Plan, that they expected that a similar approach would be taken in connection with Neuwirth, that the issue

would be brought to the Board of Directors, that Neuwirth would be treated the same as other former employees and former members of Defendant's Board of Directors, and that Neuwirth would be advised regarding the timing of exercise of his stock options.

38.     Based on these specific representations, Neuwirth reasonably believed that Defendant would continue to follow its long-established policy and course of performance, which allowed current and former employees and Board of Directors members extended time periods to exercise stock options beyond the timing procedures set forth in the Option Plan.

39.     Consistent with these representations, nowhere in the Separation Agreement did it state that Neuwirth would be required to exercise his stock options under the timing provisions in the Option Plan.

40.     Further, the Separation Agreement has no integration clause stating that its provisions constitute the entire agreement of the parties with regard to the subject matter thereof.

41.     Under the Option Plan's timing provisions, a terminated employee has three months to exercise stock options or those stock options will be terminated.

42.     Under the Separation Agreement, Neuwirth's effective date of cessation of employment was February 28, 2015.

43.     As a result, under the timing provisions in the Option Plan, Neuwirth would have been required to exercise his stock options by the end of May 2015, absent Defendant providing an additional time period for exercise of those stock options.

44.     With regard to his First Tranche of stock options, Neuwirth was given a five-year time period to exercise those stock options, so he was not under any obligation to exercise those stock options by May 2015.

45.     With regard to the Second Tranche of 33,073 stock options vested as of
Neuwirth's cessation of employment with Defendant, Defendant had not yet specifically
extended his time period to exercise those stock options, so they theoretically could have been
subject to the May 2015 stock option exercise time period.

46.     Given Defendant's well-established course of performance, representations, and
specific course of conduct toward Neuwirth, Neuwirth reasonably relied on Defendant's course
of performance and representations to believe that he would be granted additional time to
exercise the vested stock options in his Second Tranche of stock options. Had Defendant been
honest with Neuwirth, he would have exercised his vested stock options from the Second
Tranche at the time he terminated his employment with Defendant.

47.     In fact, prior to execution of his Separation Agreement, on April 21, 2015,
Neuwirth wrote an e-mail to Ms. Ben-Yehuda, the founder and President of Defendant,
specifically raising the stock option exercise timing issue relating to his Second Tranche of stock
options. In response, Ms. Ben-Yehuda advised Neuwirth that Defendant's Board of Directors
would be considering the issue. A copy of those e-mails is attached as **Exhibit 1**.

48.     Neuwirth specifically relied on this representation in connection with his rights
regarding exercise of his Second Tranche of stock options.

49.     On April 21, 2015, Neuwirth also raised this same issue with Bob Mooney, the
chair of the Compensation Committee of Defendant's Board of Directors.

50.     In an e-mail dated April 24, 2015, Neuwirth again raised the issue relating to the
time of exercise of his Second Tranche of stock options with Mr. Mooney writing: "FYI...Are
you aware of any discussions or decisions on the options before I talk to Sonia. She says there is
an update, but may be nothing."

51.     In response to this communication, Mr. Mooney wrote: "Andrew [Levitch] says that the sentence should be removed from agreement…options exercise dates will be discussed – Andrew acknowledged inconsistent approaches…Will keep you posted…Bob." Andrew Levitch was the Chief Financial Officer of Defendant. A copy of these e-mails is attached as **Exhibit 2**.

52.     In this e-mail, Defendant acknowledged inconsistent approaches in applying timing rules for exercise of Neuwirth's Second Tranche of stock options and Defendant represented that it would advise Neuwirth on this issue.

53.     Consistent with this, prior to execution of his Separation Agreement, on April 29, 2015, Neuwirth informed Ms. Ben-Yehuda and Andrew Levitch of the need for clarity on the timing of exercise of his Second Tranche of stock options, writing:

> With regard to options, my understanding from Sonia is that the Board is reviewing the appropriate requirement for exercise of options upon ceasing employment with the company for all employees. I don't want to hold up this agreement to work through the cycle of board approvals for a change to the option plan, but would want my exercise requirement to be the same as what gets approved by the Board. I don't need this in the agreement, just an assurance that I'll be treated the same as other employees going forward.

A copy of this e-mail is attached as **Exhibit 3**.

54.     On the same date, Neuwirth also sent an e-mail to Bob Mooney raising the same question with regard to exercise of his Second Tranche of stock options. Mr. Mooney wrote in response: "I'd continued to work through Sonia and Andrew—I'll keep Joel [Krikston, a Director] updated…I will follow up w/ Andrew on options and assure you are not treated differently than others…." A copy of this e-mail is attached as **Exhibit 4**.

55.     Fully aware of the timing provisions in the Option Plan for exercise of stock options, after execution of the Separation Agreement, Neuwirth immediately pursued

communications with executives at Defendant to confirm that he would be granted additional time to exercise his Second Tranche of stock options.

56.     Specifically, on May 4, 2015 in connection with the execution of his Separation Agreement, Neuwirth sent e-mails to Mr. Levitch and Ms. Ben-Yehuda stating that: "I understand you are working through the go forward standard for exercise of options under the Option Plan.  I will wait to hear from you on that for the chunk of my vested options that this applies to."  In response to this communication, Defendant never advised Neuwirth that he would be held to the timing provisions for exercise of his Second Tranche of stock options under the Option Plan.  A copy of this e-mail is attached as **Exhibit 5**.

57.     These communications relating to execution of Neuwirth's Separation Agreement make clear that Defendant acknowledged "inconsistent" approaches on the application of timing requirements for exercise of stock options, represented that the issue of extending Neuwirth's exercise time period for his Second Tranche of stock options would be brought to Defendant's Board of Directors, promised that Neuwirth would not be treated "differently" from other employees, and promised to report back to Neuwirth.  These representations were made by senior executives of Defendant and members of Defendant's Board of Directors.

58.     Despite these promises and representations, Defendant never reported back to Neuwirth prior to expiration of his stock option exercise time period under the Option Plan for his Second Tranche of stock options and Neuwirth was never advised if the Board of Directors took up the issue.

## NEUWIRTH'S REASONABLE RELIANCE ON
## DEFENDANT'S REPRESENTATIONS

59.     Given Defendant's prior course of performance, Defendant's willingness on multiple, prior occasions to extend stock option exercise time periods for others, Ms. Ben-Yehuda's representation that Defendant's Board of Directors would be addressing the issue, and Mr. Mooney's representations that Neuwirth would not be treated any differently, Neuwirth reasonably relied on Defendant's prior course of performance and these representations.

60.     As a result, Neuwirth did not exercise his Second Tranche of stock options in May 2015 in direct and reasonable reliance of Defendant's course of performance, representations, and promises.

61.     Defendant specifically induced this reliance by Neuwirth through its specific representations and promises.

## THE TENDER OFFER

62.     After leaving the employ of Defendant, Defendant was engaged in discussions about a potential tender offer where third parties would potentially purchase shares of Defendant.

63.     In connection with those discussions, on or about September 2015, Neuwirth received a capitalization table setting forth the shares and options held by current and former employees and members of Defendant's Board of Directors and respective cash values (the "Cap Table").

64.     Upon receipt of the Cap Table, Neuwirth observed that his First Tranche of stock options was properly reflected in the Cap Table.  However, Neuwirth's Second Tranche of 33,073 stock options, which were the subject of his communications with Defendant regarding the stock option exercise time period, were zeroed out on the table to show no value.

65.     The Board of Directors and management of Defendant had never reached out to Neuwirth to discuss his Second Tranche of stock options before distribution of the Cap Table that showed that those stock options were given a zero value, despite their promises and agreements to do so. The Cap Table was the first time Defendant provided any information to Neuwirth indicating that Defendant determined that Neuwirth's Second Tranche of stock options had no value. Upon information and belief, Defendant's Board of Directors had never even discussed the issue at the time Neuwirth received a copy of the Cap Table showing his Second Tranche of stock options zeroed out.

66.     Further, upon information and belief, the Cap Table showed that, contrary to Defendant's promises and representations, Neuwirth was not being treated in the same manner as Defendant treated other former employees and former members of Defendant's Board of Directors.

67.     Specifically, the Cap Table showed that at least two former members of Defendant's Board of Directors, Adrienne Kirby and Mina Teichner, were given additional time to exercise their stock options beyond the timing provisions in the Option Plan, even though they had resigned from the Board of Directors more than a year prior to the provision of the Cap Table. If the timing provisions in the Option Plan had been applied to Adrienne Kirby and Mina Teichner, their stock options would have been zeroed out on the Cap Table, just as Neuwirth's Second Tranche of stock options had been zeroed out. Based at least on the Cap Table provided to Neuwirth, these individuals were treated in a manner inconsistent with how Neuwirth was treated.

68.     The treatment provided to Adrienne Kirby and Mina Teichner was consistent with Defendant's course of performance and promises and representations to Mr. Neuwirth, but

directly contrary to the treatment provided to Mr. Neuwirth and was an express violation and breach of Defendant's promises and representations that Mr. Neuwirth would be treated the same as others.

## NEUWIRTH'S DEMAND LETTER TO DEFENDANT

69.    After review of the Cap Table, Neuwirth advised Defendant, both verbally and in writing, that Defendant's conduct was in violation of its representations to Neuwirth and its prior course of performance.

70.    By letter dated October 29, 2015, counsel for Neuwirth wrote to Defendant and members of its Board of Directors advising Defendant of its improper conduct and demanding that Defendant recognize Neuwirth's right to exercise his Second Tranche of stock options.  A copy of that letter is attached as **Exhibit 6**.

71.    Despite receipt of this letter well in advance of the closing of the Tender Offer, Defendant failed and refused to respond in any manner to this demand letter.

## CLOSING ON TENDER OFFER

72.    On or about February 26, 2016, Defendant entered into an investment and tender offer agreement ("Tender Offer") with UPMC, a Pennsylvania non-profit corporation and Merck Global Health Innovation Fund, LLC.

73.    In connection with the Tender Offer, Neuwirth was advised that UPMC provided its offer to purchase, which offer to purchase was to expire on April 11, 2016.

74.    In response to this Tender Offer, Neuwirth provided a written notice of exercise of this First Tranche of stock options and his Second Tranche of stock options and delivered funds to Defendant to cover the costs for exercising both tranches of vested stock options.

75.     Defendant accepted the written notice of exercise of stock options with regard to the First Tranche of stock options and Defendant delivered to Neuwirth share certificates representing the shares resulting from the exercise of the First Tranche of stock options. However, Defendant rejected the written notice of exercise of his Second Tranche of stock options.  This was the first time Defendant formally indicated to Neuwirth that Defendant had terminated his Second Tranche of stock options.

76.     Neuwirth tendered the shares he received as a result of exercising the options in the First Tranche along with other shares of Defendant's stock that he owned.  Based on a letter from counsel for UPMC, the Tender Offer appears to have closed on or about April 28, 2016.

77.     At the close of the Tender Offer, Neuwirth was paid for the shares he received from the exercise of his First Tranche of stock options along with other shares of Defendant's stock that he owned.  However, as Defendant failed and refused to allow Neuwirth to exercise the 33,073 vested stock options from his Second Tranche, he was unable to tender the shares he would have received for exercising those stock options.

78.     Due to Defendant's violation of its promises and representations and prior course of performance, Neuwirth was denied the opportunity to participate in the Tender Offer with regard to the 33,073 vested stock options in his Second Tranche, where Defendant took the position, inconsistent with its promises, course of performance, and actions toward others, that Neuwirth's interests in those vested stock options were terminated for failure to exercise them within the exercise period set forth in the Option Plan.

### DEFENDANT'S REFUSAL TO HONOR NEUWIRTH'S STOCK OPTIONS DESPITE ITS AGREEMENTS AND REPRESENTATIONS

79.     Defendant's refusal to treat Neuwirth the same as others despite Defendant's representations, refusal to honor its prior course of performance and promises with respect to

Neuwirth's Second Tranche of stock options, and refusal to advise Neuwirth of Defendant's
determination to terminate those stock options prior to expiration of Neuwirth's purported time
to exercise his Second Tranche of stock options under the Option Plan, has materially injured
and prejudiced Neuwirth's rights and interests.

80. Defendant's conduct was in direct violation of Defendant's agreements,
representations and promises made to Neuwirth both in writing and verbally.

81. Defendant's conduct violated its contractual obligations to Neuwirth. Defendant
breached the Option Plan as modified by its subsequent agreements with, promises to, and course
of performance regarding Neuwirth and others by terminating the Second Tranche of stock
options despite its agreements, representations, and confirmations to Neuwirth that those stock
options would be treated the same as others, which promise and modification Defendant offered
to Neuwirth and which Neuwirth accepted. Thus, Defendant breached its contractual obligations
to Neuwirth under the Option Plan as modified, as detailed above.

82. The Option Plan contains no integration clause and expressly provides that
Defendant through the Committee created under the Option Plan, can change the terms of the
plan in its discretion. Defendant used that discretion to change the terms of the Option Plan
through its course of performance and its representations and promises to Neuwirth as detailed
above. Defendant thereby became contractually obligated to act consistent with its
representations to Neuwirth and its prior course of performance.

83. Defendant also breached the implied covenant of good faith and fair dealing by
exercising its discretion under the Option Plan in a bad-faith manner designed to breach its
promises and representations to Neuwirth, while acting in a contrary manner to benefit other

similarly situated former employees and Board of Directors members, despite Defendant's agreement with and representations to Neuwirth that he would be treated the same as others.

84.     Defendant's conduct is also in violation of the promissory estoppel doctrine. Defendant specifically represented and promised Neuwirth that he would be treated the same as others and Defendant's course of performance over a long period of time was to not strictly enforce the stock option exercise timing provisions in the Option Plan. Neuwirth reasonably relied on those representations, which representations lulled and induced Neuwirth into not exercising his Second Tranche of stock options in May 2015. Neuwirth has been injured as a result of his reliance of Defendant's false representations and promises. As a result, Defendant has violated the promissory estoppel doctrine.

85.     Defendant has also violated the equitable estoppel doctrine. Defendant specifically represented that Neuwirth would be treated the same as others and Defendant's course of performance over a long period of time was to not strictly enforce the stock option exercise timing provisions in the Option Plan. Defendant also represented that its Board of Directors was reviewing the issue and Neuwirth would be timely advised of Defendant's position on the timing of exercise of his options. Contrary to its promises and representations, Defendant never advised Neuwirth that his Second Tranche of stock options would be treated as terminated and of no value. Neuwirth only first became aware of this through distribution of the Cap Table, which indicated that Defendant had determined that the Second Tranche of stock options had no value. Likewise, Defendant failed and refused to advise Neuwirth prior to May 2015 of its planned approach to treat the Second Tranche of stock options as terminated if not exercised in May 2015, and indeed never indicated to Neuwirth how it planned to treat his Second Tranche of stock options until distribution of the Cap Table. In fact, Defendant never formally advised

Neuwirth that his Second Tranche of stock options would be treated as terminated until it rejected Neuwirth's effort to exercise them to participate in the Tender Offer. Given this improper and bad-faith conduct, Defendant is equitably estopped for terminating the Second Tranche of stock options.

86. Had Defendant told Neuwirth that it was going to require him to exercise the Second Tranche of stock options in accordance with the Option Plan, Neuwirth would have done so at the time he ceased employment with Defendant.

87. Defendant also fraudulently induced Neuwirth to enter into the Separation Agreement and not to exercise his Second Tranche of stock options in May 2015. Defendant intentionally made false statements and promises that Neuwirth would be treated the same as others with regard to the exercise of stock options. Defendant also represented it would consider the issue and advise Neuwirth, which induced Neuwirth to enter into the Separation Agreement and not to exercise the Second Tranche of stock options until he heard back from Defendant. Defendant intentionally did not consider the issue and did not make any effort to advise Neuwirth until Neuwirth's 90-day stock option exercise time period under the Option Plan had expired. Defendant knew its statements were false when made, as evidenced by its conduct. Defendant intentionally made these statements to induce reliance by Neuwirth. Defendant published the statements to Neuwirth. Neuwirth reasonably relied on the fraudulent representations. Neuwirth was directly injured and damaged by his reliance on this false and fraudulent representation.

88. In an effort to avoid litigation, by letter dated May 19, 2016, counsel for Neuwirth advised Defendant and provided a draft complaint detailing how Defendant had breached contractual obligations to Neuwirth, breached the implied covenant of good faith and fair

dealing, violated the doctrines of promissory and equitable estoppel, and engaged in fraudulent inducement. Neuwirth offered Defendant the opportunity to resolve these claims without litigation. Defendant ignored this letter, necessitating the filing of this lawsuit. A copy of that letter without the exhibit is attached as **Exhibit 7.**

## THE DAMAGES AND INJURIES SUFFERED BY NEUWIRTH AS A RESULT OF DEFENDANT'S IMPROPER CONDUCT

89.      As a result of Defendant's improper conduct, Neuwirth has suffered damages in excess of $241,000.00.

90.      In connection with the closing of the Tender Offer, the purchasers paid approximately $9.16 per share.

91.      Had the Defendant kept its prior promises, met its prior representations, and acted consistently with its prior course of performance, Defendant would have allowed Neuwirth to exercise his Second Tranche of 33,073 vested stock options and participate in the Tender Offer, which would have allowed Neuwirth to obtain a net payment in excess of $241,000.00.

92.      Neuwirth has suffered these damages and injuries as a direct result of Defendant's bad faith and improper conduct in violation of its prior, express promises and representations and by its actions contrary to its long-established course of performance.

## COUNT I
## BREACH OF CONTRACT

93.      Neuwirth repeats and realleges the above allegations as if set forth in full here.

94.      The Separation Agreement and the Option Plan, as modified by Defendant's course of performance, and Defendant's promises and offers as accepted by Neuwirth, constitute a valid and binding contract between Neuwirth and Defendant.

95.      Neuwirth fully performed his contractual obligations.

96.     Defendant breached its contractual obligations to Neuwirth by terminating the Second Tranche of stock options.

97.     As result of Defendant's breaches, Neuwirth has been damaged by Defendant in an amount to be determined at trial, but currently not less than Two Hundred Forty-One Thousand ($241,000.00) Dollars, together with consequential damages and interest in an amount to be proven at trial.

**COUNT II**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

98.     Neuwirth repeats and realleges the above allegations as if set forth in full here.

99.     The Separation Agreement and the Option Plan, as modified by Defendant's course of performance, and Defendant's promises and offers as accepted by Neuwirth, constitute a valid and binding contract between Neuwirth and Defendant.

100.    Neuwirth fully performed his contractual obligations.

101.    Defendant breached the implied covenant of good faith and fair dealing by exercising its discretion under the Option Plan in a bad-faith manner to injure Neuwirth in a manner directly contrary to and in breach of its representations and promises to Neuwirth.

102.    Defendant's actions were taken in a bad-faith effort to intentionally deny Neuwirth the benefit of his bargain with Defendant.

103.    As result of Defendant's breach of the implied covenant of good faith and fair dealing, Neuwirth has been damaged by Defendant in an amount to be determined at trial, but currently not less than Two Hundred Forty-One ($241,000.00) Dollars, together with consequential damages and interest in an amount to be proven at trial.

## COUNT III
## PROMISSORY ESTOPPEL

104.   Neuwirth repeats and realleges the above allegations as if set forth in full here.

105.   Defendant specifically induced Neuwirth not to exercise the Second Tranche of stock options in May 2015 by its false representations to Neuwirth.

106.   Based on Defendant's assurances, on which Neuwirth reasonably and foreseeably relied, Neuwirth did not exercise the Second Tranche of stock options in May 2015, ultimately resulting in Defendant improperly attempting to terminate those stock options.

107.   As a result of Neuwirth's reasonable reliance on Defendant's promises and representations, Neuwirth was damaged by Defendant's improper termination of the Second Tranche of stock options.

108.   Under the doctrine of promissory estoppel, Defendant is estopped from terminating the Second Tranche of stock options.  Defendant is also obligated to pay damages and compensate Neuwirth for the injuries he has suffered from Defendant's conduct in an amount to be proven at trial.

## COUNT IV
## EQUITABLE ESTOPPEL

109.   Neuwirth repeats and realleges the above allegations as if set forth in full here.

110.   Defendant specifically induced Neuwirth not to exercise the Second Tranche of stock options in May 2015 by its false representations to Neuwirth.

111.   Based on Defendant's assurances, on which Neuwirth reasonably and foreseeably relied, Neuwirth did not exercise the Second Tranche of stock options in May 2015, ultimately resulting in Defendant improperly attempting to terminate those stock options.

112.   As a result of Neuwirth's reasonable reliance on Defendant's promises and representations, Neuwirth was damaged by Defendant's improper termination of the Second Tranche of stock options.

113.   Under the doctrine of equitable estoppel, Defendant is estopped from terminating the Second Tranche of stock options.  Defendant is obligated to pay damages and compensate Neuwirth for the injuries he has suffered from Defendant's conduct in an amount to be proven at trial.

### COUNT V
### FRAUDULENT INDUCEMENT

114.   Neuwirth repeats and realleges the above allegations as if set forth in full here.

115.   Defendant fraudulently induced Neuwirth to enter into the Separation Agreement and not to exercise his Second Tranche of stock options in May 2015.

116.   Defendant intentionally made the factually false statements and promises that Neuwirth would be treated the same as others.

117.   Defendant knew the statements were false when made, as evidenced by its conduct.

118.   Defendant intentionally made these false statements to induce reliance by Neuwirth.

119.   Defendant published the statements to Neuwirth.

120.   Neuwirth reasonably relied on the fraudulent representations to his detriment by entering into the Separation Agreement and not exercising his Second Tranche of stock options in May 2015 as a direct result of Defendant's false representations.

121.   Neuwirth was directly injured and damaged by his reliance on these false and fraudulent representations.

122.     Defendant is obligated to pay damages and compensate Neuwirth for the injuries he has suffered from Defendant's fraudulent inducement, and Neuwirth is also entitled to punitive damages, in amounts to be proven at trial.

WHEREFORE, Neuwirth demands:

(a) judgment in his favor on Counts I through V;

(b) his costs, reasonable attorneys' fees, expenses, and interest; and

(c) such other and further relief as the Court deems just and proper.

DATED:  June 3, 2016

LECLAIRRYAN, A Professional Corporation

By:   /s/ *Andrew P. Zappia*
      Andrew P. Zappia
      Richard A. McGuirk
70 Linden Oaks, Suite 210
Rochester, New York 14625
Tel:  (585) 270-2100
Fax:  (585) 270-2179
Richard.McGuirk@leclairryan.com
Andrew.Zappia@leclairryan.com

*Attorneys for Plaintiff Daniel B. Neuwirth*